Jan THOMSEN, Plaintiff,

v.

GEORGIA-PACIFIC CORRUGATED, LLC, Defendant.

CIV. NO. 1:15-01506 WBS SAB

United States District Court,
E.D. California.

Signed June 2, 2016

Amanda Brooke Whitten, Law Offices of Shelley G. Bryant, Fresno, CA, for Plaintiff.

James Alan Neal Smith, Susan Pangborn, PHV, Kilpatrick Townsend & Stockton LLP, San Francisco, CA, Jennifer Rasile Everitt, Kilpatrick Townsend & Stockton LLP, Raleigh, NC, for Defendant.

## MEMORANDUM AND ORDER RE: MOTION FOR SUMMARY JUDGMENT

### WILLIAM B. SHUBB, UNITED STATES DISTRICT JUDGE

Plaintiff Jan Thomsen brought this employment disability discrimination action after his previous employer, defendant Georgia-Pacific Corrugated, LLC, terminated his employment. Pursuant to Federal Rule of Civil Procedure 56, defendant now moves for summary judgment on all of plaintiff's claims.

### I. Brief Factual and Procedural Background

Plaintiff began working for defendant in approximately 1991 at its corrugated container plant in Madera, California. After injuring his shoulder while at work in May 2012, plaintiff went on workers' compensation leave and returned to work in January 2013 after undergoing surgery on his left shoulder. (Thomsen Dep. at 24:12-19, 55:13-22.) At the time he went on leave, plaintiff had been working as a cut and die operator. (Id. at 21:8-11.) Defendant initially accommodated his disability by assigning him to a temporary position and then transferring him to a new position as an assistant end gluer. After working as an assistant end gluer, plaintiff claims he needed additional modifications to that position to accommodate his disability.

On February 19, 2014, defendant contends plaintiff was required to work overtime, but refused to do so and left the

plant in violation of defendant's policies. After performing an investigation, defendant terminated plaintiff's employment on March 3, 2014 allegedly because of that conduct.

Alleging that defendant failed to engage in the interactive process and accommodate his disability and that defendant terminated him because of his disability, plaintiff initiated this action in state court. In his Complaint, plaintiff alleges the following claims: (1) disability discrimination in violation of subsection 12940(a) of California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12940-12951; (2) failure to provide reasonable accommodation in violation of subsection 12940(m) of FEHA; (3) failure to engage in the interactive process in violation of subsection 12940(n) of FEHA; (4) wrongful termination in violation of public policy; and (5) defamation. (Docket No. 1–1.) After removing the action to this court on the basis of diversity of citizenship, defendant now moves for summary judgment on all of plaintiff's claims.[1] (Docket No. 19–1.)

II. Analysis

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. Id.

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S.Ct. 2548 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence...will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252, 106 S.Ct. 2505.

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. Id. at 255, 106 S.Ct. 2505. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge...ruling on a motion for summary judgment...." Id.

---

1. Plaintiff filed eight objections to evidence defendant submitted. (Docket No. 21–2.) Notwithstanding the questionable grounds for most of plaintiff's objections, the court denies them as moot because it does not rely on any of that evidence in granting summary judgment in favor of defendant.

Defendant also takes issue with plaintiff's 470 additional statements of undisputed fact and cursory analysis of those facts in his brief. The court will not avoid the merits of plaintiff's claims because of the poor way in which counsel opposed the motion and therefore denies defendant's motion to strike.

### A. FEHA Reasonable Accommodation & Interactive Process

#### 1. Subsection 12940(m): Reasonable Accommodation

■ Under subsection 12940(m) of FEHA, it is unlawful for an employer "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee" unless the accommodation would "produce undue hardship." Cal. Gov't Code § 12940(m); see also Cal. Gov't Code § 12926(u) (defining "undue hardship"). "The elements of a reasonable accommodation cause of action are (1) the employee suffered a disability, (2) the employee could perform the essential functions of the job with reasonable accommodation, and (3) the employer failed to reasonably accommodate the employee's disability." Nealy v. City of Santa Monica, 234 Cal.App.4th 359, 373, 184 Cal. Rptr.3d 9 (2d Dist.2015). Defendant moves for summary judgment based solely on the third element, arguing that it reasonably accommodated plaintiff as a matter of law.

■ "A reasonable accommodation is a modification or adjustment to the work environment that enables the employee to perform the essential functions of the job he or she holds or desires." Id. at 373, 184 Cal.Rptr.3d 9; see id. at 374–75, 184 Cal. Rptr.3d 9 ("Reasonable accommodations may include, among other things, job restructuring or permitting an alteration of when and/or how an essential function is performed," but "elimination of an essential function is not a reasonable accommodation."). "Reasonable accommodation may also include 'reassignment to a vacant position' if the employee cannot perform the essential functions of his or her position even with accommodation." Id. at 377, 184 Cal.Rptr.3d 9 (quoting Cal. Gov't Code § 12926(p)(2)). "FEHA requires the employer to offer the employee 'comparable' or 'lower graded' vacant positions for which he or she is qualified," but "does not require the employer to promote the employee or create a new position for the employee to a greater extent than it would create a new position for any employee, regardless of disability." Id. (quoting Cal. Code Regs., tit. 2, § 11068(d)(1), (2)).

#### 2. Subsection 12940(n): Interactive Process

■ Under subsection 12940(n), it is unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." Cal. Gov't Code § 12940(n). "The employee must initiate the process unless the disability and resulting limitations are obvious," and the employee must " 'specifically identify the disability and resulting limitations, and [ ] suggest the reasonable accommodations.' " Scotch v. Art Inst. of Cal.–Orange Cnty., Inc., 173 Cal.App.4th 986, 1013, 93 Cal.Rptr.3d 338 (4th Dist.2009) (quoting Taylor v. Principal Fin. Grp., Inc., 93 F.3d 155, 165 (5th Cir.1996)). "FEHA requires an informal process with the employee to attempt to identify reasonable accommodations, not necessarily ritualized discussions." Nealy, 234 Cal.App.4th at 379, 184 Cal.Rptr.3d 9.

■ "Both employer and employee have the obligation 'to keep communications open' and neither has 'a right to obstruct the process.' " Scotch, 173 Cal. App.4th at 1014, 93 Cal.Rptr.3d 338 (quoting Jensen v. Wells Fargo Bank, 85 Cal. App.4th 245, 266, 102 Cal.Rptr.2d 55 (2d Dist.2000)). "Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is

available, or more accessible, to one party." Gelfo v. Lockheed Martin Corp., 140 Cal.App.4th 34, 62 n. 22, 43 Cal.Rptr.3d 874 (2d Dist.2006). "Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith." Id.

### 3. Analysis of the Subsections 12940(m) and (n) Claims

When plaintiff returned to work with restrictions in January 2013, it is undisputed that defendant initially accommodated his disability by assigning him to work on a long-term temporary project of supervising other temporary employees who were sorting damaged containers. (Thomsen Dep. at 25:8-27:14, 31:5-17; Pangborn Decl. at 156 (Docket No. 19-2).) As of October 2013, plaintiff's physician indicated that plaintiff had "permanent restrictions" and could not carry anything over thirty pounds. (Pangborn Decl. at 156.) Upon completion of the temporary project, it is undisputed that plaintiff was still unable to return to his prior position.

At that time, defendant's Plant Superintendent, Jose Garcia; General Manager, Anthony Garcia; Human Resources Generalist, Shanna Naeole; and Plant Manager, Joe Del Razo met to discuss potential accommodations for plaintiff. (Naeole Dep. at 38:4-8.) They considered all positions for which plaintiff was qualified and that would accommodate his lifting restriction. (J. Garcia Dep. at 76:6-8; A. Garcia Dep. at 56:11-57:24.) Defendant determined that the potential positions for plaintiff included a forklift driver and an assistant end gluer. (J. Garcia Dep. at 76:6-8.)

Anthony and Jose Garcia and Del Razo then met with plaintiff to discuss the potential new positions. (A. Garcia Dep. at 57:10-21; Thomsen Dep. at 40:11-23.) At that time, there was not an opening for a forklift driver, (A. Garcia Dep. at 57:15-25), and plaintiff does not contend that he should have been offered that position. There was an opening for an assistant end gluer, and defendant offered that position to plaintiff as a lateral transfer with the same pay. (Thomsen Dep. at 54:4-8.) Plaintiff indicated at that meeting that he could fulfill the responsibilities of the position and accepted the transfer. (A. Garcia Dep. at 57:15-21; Thomsen Dep. at 48:11-50:1.)

Despite fulfilling their obligations under FEHA as of that meeting and transfer, plaintiff contends defendant nonetheless violated FEHA when (1) defendant did not subsequently offer plaintiff a quality lab technician ("QL Technician") position instead of the assistant end gluer position; and (2) failed to subsequently modify the assistant end gluer position.

#### a. QL Technician Position

■ At some point after offering plaintiff the assistant end gluer position, plaintiff claims he informed defendant that he was interested in an opening for a QL Technician. (Thomsen Dep. at 41:7-24.) Jose and Anthony Garcia testified that the QL Technician position would not have been consistent with plaintiff's lifting restriction because it could require lifting in excess of thirty pounds when visiting various customers. (A. Garcia Dep. at 58:11-59:2; J. Garcia Dep. at 48:15-18.) Plaintiff also testified that he was told that the QL Technician position was not possible for him because it occasionally requires lifting over forty pounds. (Thomsen Dep. at 106:13-20.) Anthony Garcia testified that the lifting requirement of a QL Technician could not have been accommodated because the lifting occurs at customers' facilities and thus the ability to use any lifting device would have been dependent on what each customer had available. (A. Garcia Dep. at 58:24-59:8.)

■ Even assuming that lifting in excess of thirty pounds was not an essential function of the QL Technician position and that plaintiff was qualified for that position,[2] "FEHA does not obligate an employer to choose the best accommodation or the specific accommodation a disabled employee or applicant seeks." Raine v. City of Burbank, 135 Cal.App.4th 1215, 1222, 37 Cal.Rptr.3d 899 (2d Dist.2006). It is undisputed that plaintiff initially agreed that the assistant end gluer position accommodated his disability and FEHA did not obligate defendant to offer plaintiff the position he found more preferable.

It is therefore undisputed that at the time defendant had transferred plaintiff to the assistant end gluer position, it had adhered to its obligation to engage in the interactive process and accommodate plaintiff's disability.

### b. Modifications to Assistant End Gluer Position

■ After working as an assistant end gluer, plaintiff testified that he discovered the duties were not consistent with his lifting restriction and that he needed modifications. About two weeks to one month after working as an assistant end gluer, plaintiff raised concerns about the position with Kristina Lloyd in Human Resources. (Thomsen Dep. at 55:3-13.) He contends he told Lloyd that the occasional need to lift more than thirty pounds, the long hours, and the manual operation of the overhead lever were causing him shoulder pain. (Id. at 16:4-13, 49:1-7, 50:11-51:13, 55:15-23; see also Lloyd Dep. at 102:21-103:11 (testifying that she recalls plaintiff complaining about shoulder pain when he had to work overtime, but that she does not recall him complaining about the overhead lever).) Plaintiff also contends that "Mr. Garcia...was standing in the door" when he was talking with Lloyd and that he told Garcia that "it would have been nice for him to send a message out to all supervisors to let them know of [his] restrictions." (Thomsen Dep. at 136:20-137:16.)

In response to plaintiff's concerns, Lloyd informed plaintiff that he would need to return to his doctor to determine whether additional restrictions were needed. (Id. at 55:24-56:2; Lloyd Dep. at 103:21-23.) Lloyd also emailed defendant's third-party workers' compensation claims representative Jennifer Brown from ESIS about plaintiff's complaints of pain from "working over 8 hours and extension forward and upwards." (Whitten Decl. Ex. C at Ex. 61 (Docket No. 21); Brown Dep. at 10:12-11:18, 19:3-5.) Although Brown left a message for plaintiff recommending he return to his physician, she recognized that ESIS's involvement was limited to plaintiff's workers' compensation claim and that it was not involved with requests for accommodations under FEHA. (Brown Dep.

---

2. Genuine disputes exist as to whether plaintiff was in fact qualified for the QL Technician position. While it is undisputed plaintiff did not possess the necessary computer skills for the position, (J. Garcia Dep. at 48:2-49:2; Thomsen Dep. at 21:21-22:12), a reasonable jury could find that plaintiff could have taught himself those skills, (see J. Garcia Dep. at 49:13-24 (testifying that he had successfully taught himself the necessary computer skills when he had previously worked as a QL Technician and that he did not see any reason why plaintiff could not have also taught himself those skills)).

Defendant also contends that plaintiff lacked the necessary customer service experience and skills for that position. In the more than twenty years plaintiff worked for defendant, he had worked exclusively in production roles that primarily required physical labor and never gained customer service experience. (Thomsen Dep. at 21:21-22:12.) At the same time, there is some evidence that defendant offered public speaking training for its employees and plaintiff could have been eligible for that training. (See J. Garcia Dep. 20:22-21:18.)

at 18:24-19:19, 31:21-32:20.) Lloyd relaying plaintiff's complaints to ESIS thus did not facilitate discussions about potential accommodations for plaintiff.

Plaintiff also testified that he complained to his shift supervisor, Leonard Lara, on one occasion that he could not work overtime because his "arm hurt." According to plaintiff, Lara "yelled" at him and told him that he had "been cleared" to work. (Thomsen Dep. at 124:18-24.) Jose Garcia testified that plaintiff told him on one occasion that he was experiencing shoulder pain in the assistant end gluer position. (J. Garcia Dep. at 43:24-44:19.) Jose Garcia claims he told plaintiff to "go back" to his doctor and that he would inform Human Resources of plaintiff's concern. (Id. at 44:22-24.) While Jose Garcia verbally informed Human Resources that plaintiff had complained about his shoulder pain, there is no evidence that anyone from Human Resources followed up with plaintiff. (Id. at 44:25-45:9.)

It is undisputed plaintiff never returned to his physician to request additional restrictions after he began working as an assistant end gluer. (Thomsen Dep. at 55:24-56:10.) Because plaintiff failed to return to his physician after Lloyd and Jose Garcia requested him to, defendant contends plaintiff's reasonable accommodation and interactive process claims must fail.

It is undisputed, however, that plaintiff's physician had already restricted plaintiff from lifting in excess of thirty pounds and plaintiff complained to defendant that his duties as an assistant end gluer occasionally required him to lift in excess of that restriction. Although defendant contends that plaintiff elected to lift multiple bundles and could have avoided lifting in excess of thirty pounds, plaintiff has put forth evidence from which a jury could find that plaintiff felt compelled to lift multiple bundles. First, plaintiff testified that the speed of the process required him to move about four bundles at a time, which weighed in excess of thirty pounds when moved together. (Id. at 52:5-16.) He also claimed that moving the leftover corrugated cardboard pieces known as dunnage exceeded his restrictions because even though each individual dunnage was under ten pounds, the speed of the process required that he pick up multiple pieces at a time. (Id. at 53:2-54:3.)

Second, plaintiff testified that the machine operator he was assigned to work with, Jose Renteria, was not "accommodating" and allowed the machine to keep running when it was getting backed up and materials were falling. (Id. at 70:3-23.) Plaintiff testified he told Supervisor Chris McMillan how Renteria's behavior was risking injury to him and McMillan indicated that he had heard similar complaints about Renteria, but McMillan did not do anything to address plaintiff's concerns. (Id. at 70:3-71:25.)

In light of this evidence, a reasonable jury could find that defendant had an obligation to continue to engage in the interactive process to assess whether the assistant end gluer position could be modified to prevent plaintiff from lifting in excess of his restriction.

With respect to plaintiff's complaints about overtime hours and the overhead lever, it is undisputed that plaintiff's physician had not restricted plaintiff's ability to operate an overhead lever or work overtime. (Id. at 58:1-4.) Relying on King v. United Parcel Service, Inc., 152 Cal. App.4th 426, 60 Cal.Rptr.3d 359 (3d Dist. 2007), defendant contends that plaintiff's failure to obtain a physician's note as to these restrictions is fatal to his FEHA accommodation and interactive process claims.

In King, the employee claimed that the employer failed to reasonably accommodate his blood disorder when it required him to work a later shift. After returning from a medical leave of absence because of his blood disorder, the plaintiff's physician had cleared him to work "regular hours." King, 152 Cal.App.4th at 443, 60 Cal. Rptr.3d 359. The parties disputed whether the "regular hours" the employee was cleared to work were regular "business hours" or the later hours he had been working prior to going on disability. Id. In granting the employer's motion for summary judgment on the employee's FEHA claim, the court emphasized that the employee had not "sustained his burden of demonstrating a genuine issue of material fact given his failure to get additional clarification from his doctor to specifically restrict his hours and to communicate his limitations to his supervisors." Id. at 444, 60 Cal.Rptr.3d 359. It concluded that it was "incumbent upon [the employee] to produce clear and unambiguous doctor's orders restricting the hours he could work." Id.

King cannot be interrupted as holding that an employee's FEHA claim will necessarily fail in the absence of a physician's note itemizing each restriction. Prior to finding that the employee had failed to carry his burden, the court in King recognized that "the interactive process compelled by FEHA requires flexibility by both the employer and employee, and that no magic words are required to necessitate accommodation." Id. at 444, 60 Cal.Rptr.3d 359. It also found the doctor's note necessary in that case because the employee had not "establish[ed] that he communicated his distress to his supervisors or made the kind of specific request for a modified work schedule required to trigger an employer's duty to provide accommodation." Id. The employee had also complained about working the later hours prior to his

disability and had an "apparent ability" to work them after returning from disability leave. Id.

Unlike in King, defendant knew and plaintiff's physician had confirmed that plaintiff had a permanent shoulder injury and his complaints about the overhead lever and overtime hours related directly to that disability. Plaintiff also made repeated and specific complaints to defendant about how operating the overhead lever and working overtime were causing him shoulder pain. Under these facts, a reasonable jury could find that FEHA obligated defendant to do more than simply tell plaintiff to go back to his physician.

Allen v. Pacific Bell, 348 F.3d 1113 (9th Cir.2003), is also distinguishable. In that case, the employee's physician had restricted the employee to sedentary positions and the employee subsequently requested to be reassigned to his prior, nonsedentary position. Allen, 348 F.3d at 1115. Pursuant to its "policy that it would reconsider an employee's disability restrictions if he submitted medical evidence that his health had changed," the employer required the employee to obtain a release from his physician before the employer would reassign him to a non-sedentary position. Id. Because the employee failed to obtain this release, the Ninth Circuit concluded the employer had complied with its obligations under FEHA. Id. Unlike in Allen, defendant has not cited any internal policy requiring that a physician itemize each possible modification that may stem from a diagnosed and documented disability. Defendant's adjustment of how plaintiff could operate the overhead lever or whether he worked overtime hours would not have required defendant to take action that was entirely inconsistent with the limitations placed by plaintiff's physician like in Allen.

There is also circumstantial evidence from which a reasonable jury could find that defendant could have addressed plaintiff's concerns about the overhead lever. Plaintiff testified that he asked "Rudy" in maintenance whether the overhead lever could be moved and "Rudy" told him that it was possible to move the lever. (Thomsen Dep. at 51:14-24.) Defendant suggests that plaintiff could have independently modified how he operated the lever by slightly altering his stance and maneuvering the lever with his right hand instead of his left, (Garcia Decl. ¶ 14 (Docket No. 19–3)), but plaintiff contends that he needed to use his right hand to "tidy[ ] the product" while operating the lever with his left hand, (Thomsen Dep. at 62:14-63:9). A reasonable jury could thus find that FEHA obligated defendant to discuss these modifications with plaintiff and find out whether this adjustment was possible for him.

As the court in King explained, an employer cannot prevail at summary judgment on a FEHA reasonable accommodation claim unless "it establishes through undisputed facts that...the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." 152 Cal.App.4th at 442–43, 60 Cal.Rptr.3d 359. A reasonable jury could find that plaintiff's repeated complaints obligated defendant to at least engage in a dialogue with plaintiff in response to his concerns about the overhead lever and overtime hours before summarily concluding that he had to return to his doctor.

Accordingly, because triable issues of fact exist as to whether defendant continued to engage in the interactive process and reasonably accommodate plaintiff after transferring him to the assistant end gluer position, the court must deny defendant's motion for summary judgment on plaintiff's subsection 12940(m) and (n) FEHA claims.

## B. FEHA Subsection 12940(a) Disability Discrimination

■ Subsection 12940(a) of FEHA renders it unlawful for an employer to discharge an employee because of the employee's "medical condition" unless the employee, "because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations." Cal. Gov't Code § 12940(a)(1). "California applies the McDonnell Douglas burden-shifting framework and other federal employment law principles when interpreting the FEHA." Schechner v. KPIX–TV, 686 F.3d 1018, 1023 (9th Cir.2012).

■ Under this framework, the plaintiff must first establish a prima facie case, which "requires the employee to show he or she (1) suffered from a disability, (2) was otherwise qualified to do his or her job, and (3) was subjected to adverse employment action because of the disability." Nealy, 234 Cal.App.4th at 378, 184 Cal.Rptr.3d 9. If "the plaintiff establishes a prima facie case, the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to raise a genuine issue of fact...that its action was taken for a legitimate, nondiscriminatory reason." Guz v. Bechtel Nat'l Inc., 24 Cal.4th 317, 355–56, 100 Cal. Rptr.2d 352, 8 P.3d 1089 (2000) (internal quotation marks omitted). "If the employer sustains this burden, the presumption of discrimination disappears," and the plaintiff must then show "the employer's proffered reasons as pretexts for discrimination, or [ ] offer any other evidence of discriminatory motive." Id.

Defendant concedes for purposes of this motion that plaintiff can establish a prima facie case but contends it had a legitimate,

non-discriminatory reason for terminating plaintiff and that plaintiff cannot establish a triable issue of fact that its reason was pretextual.

1. Legitimate, Non-Discriminatory Reason

■ Defendant argues it legitimately terminated plaintiff because plaintiff refused to work overtime at the end of his shift in violation of its Work Schedule Policy. Under FEHA, "it does not matter whether plaintiff actually did commit [the alleged misconduct] as long as [the employer] honestly believed he did." King, 152 Cal.App.4th at 433, 60 Cal.Rptr.3d 359; see also King, 152 Cal.App.4th at 436, 60 Cal.Rptr.3d 359 ("It is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that is at issue in a discrimination case.").

■ Defendant's written Work Schedule Policy states:

> In the case of multiple shift operations, employees shall not leave their stations until relieved by the oncoming shift, nor before the end of their shift. If an employee's relief does not appear, the employee must remain at his/her station until relived or given permission to leave by the supervisor on duty.

(Pangborn Decl. at 116.) The Employee Manual explains that an unscheduled requirement to continue working would constitute "Incidental Overtime." (See id. ("Incidental overtime may become necessary when an illness or emergency keeps co-workers from being at work as anticipated.").) As memorialized in the Employee Manual, an employee is "expected to cooperate" with a request to work incidental overtime "as a condition of [his or her] employment." (Id.) With incidental overtime, an employee may "request[ ] to be released from the overtime, [and] the company, in its discretion, may attempt to find a replacement for that position and offer such work as voluntary overtime." (Id.)

On February 19, 2014, plaintiff had worked his regularly scheduled night shift as an assistant end gluer, with Renteria working as the machine operator. (Thomsen Dep. at 67:5-8, 68:9-14, 69:1-8.) Lara was working as the production supervisor for the shift and, shortly before plaintiff's shift ended, Lara informed Renteria and plaintiff that both of the assistant end gluers for the next shift had called in sick and that either Renteria or plaintiff needed to continue working. (Id. at 72:11-25.) Plaintiff contends he told Lara he could not stay for the next shift because he had two appointments.[3] Lara testified that after plaintiff indicated he had appointments, he inquired whether Renteria could stay and when Renteria said he could not stay, Lara told plaintiff that he had to stay. (Lara Dep. at 7:16-23.)

After discovering that plaintiff had left, Lara reported to Jose Garcia that plaintiff had left without permission and Jose Garcia and Lara contacted Del Razo. (Del Razo Dep. at 87:4-25.) Del Razo and Lloyd began an investigation and plaintiff again indicated he had appointments when they contacted him at home to inquire why he had left. (Id. at 90:25-91:11.) Plaintiff was then suspended pending further investigation, which included obtaining written statements from Lara, Garza, and Renteria and verifying when plaintiff had

---

**3.** Plaintiff later conceded in his deposition that he did not have any appointments, but made up that excuse because he did not want to admit that he was experiencing too much pain to work overtime. (Id. at 73:1-75:25.) While the jury may ultimately consider plaintiff's dishonesty in assessing his credibility, his false excuse is not relevant to his FEHA claim because defendant did not learn that his excuses were false until after this litigation commenced.

clocked out that day. (Id. at 88:24-89:13.) After their investigation, Del Razo and Lloyd concluded that plaintiff had left the facility in violation of Lara's order and the company's policy.

Because Del Razo and Lloyd had both worked for defendant for less than a year and had not handled a similar incident before, they talked to Jose Garcia about what would be the appropriate disciplinary action. (Lloyd Dep. at 22:21-24.) Jose Garcia recalled that defendant had discharged at least one other employee in the past for similar misconduct. (Id. at 22:21-24:11; see also J. Garcia Dep. at 12:19-22 (testifying he believes he gave Lloyd the name of two employees terminated under similar circumstances in the past).)

Plaintiff concedes he understood that he was required to continue working unless his replacement relieved him or his supervisor gave him permission to leave. (Thomsen Dep. at 76:12-16.) According to plaintiff, he was authorized to leave because Richard Ramirez relieved him and Lara never told him he had to stay. (Id. at 77:4-17, 79:4-12.) Ramirez has indicated that he believed he was plaintiff's relief that day and had in fact informed plaintiff that he was his relief prior to plaintiff leaving.[4] (Ramirez Decl. ¶ 4.) It is undisputed, however, that Ramirez did not inform defendant that believed he had relieved plaintiff until after plaintiff was terminated.

Under these circumstances, defendant has established that it had a legitimate reason for terminating plaintiff after he refused to work incidental overtime and defendant had no reason to know that Ramirez claimed to have relieved plaintiff.

#### 2. Pretext

■■■ "A plaintiff may establish pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc., 642 F.3d 728, 746 (9th Cir. 2011) (internal quotation marks and citation omitted). "While [the court] must liberally construe plaintiff's showing and resolve any doubts about the propriety of a summary judgment in plaintiff's favor, plaintiff's evidence remains subject to careful scrutiny." King, 152 Cal.App.4th at 433, 60 Cal.Rptr.3d 359. The "[p]laintiff's evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and termination." Id.

■■■ Even if defendant had an honest belief that plaintiff left work on February 19, 2014 in violation of its policy, plaintiff contends that his termination for that misconduct was mere pretext because (1) defendant's own policies supported discipline, not termination and (2) defendant's decision was motivated by plaintiff's disability and potential disability leave.

While defendant's policy requires an employee to work incidental overtime as outlined above, it does not identify the consequence of an employee's failure to work incidental overtime. At the same time, the Employee Manual has a detailed "no fault" attendance policy. The attendance policy defines "absences" as "any time missed by an employee when he/she is scheduled for work." (Pangborn Decl. at 119.) The attendance policy provides an identified

---

4. Genuine disputes exist as to who was identified as working on the schedule for February 19, 2014. Taking all inferences in favor of plaintiff, the schedule indicated that Ramirez was relieving plaintiff. (See Ramirez Decl. ¶ 3.)

number of points that are assessed under various circumstances and the potential disciplinary actions resulting from incurring points, with a total of nine points amounting to just cause for termination. (Id. at 120–21.) The attendance policy provides for the assessment of one point if an employee leaves a shift sixty or more minutes early and for the assessment of two points if an employee fails to call in sick or show up for a scheduled shift. (Id.)

Although Del Razo acknowledges this attendance policy, he believes that the attendance policy did not apply to plaintiff having "abandoned his shift...without authorization." (Del Razo Dep. at 93:8-94:6.) Del Razo could not explain what "no fault" means under the attendance policy, but testified that abandoning a shift does not come within the attendance policy for leaving early. (Id. at 94:14-95:22.) Anthony Garcia also recognized that the Employee Manual did not indicate that "walking off the job" was a terminable offense, but that it was an "immediate discharge violation" even if it was not a written policy. (A. Garcia Dep. at 40:21-41:6.) While Anthony Garcia expected that employees would be familiar with this unwritten "policy," he testified that he had not previously terminated an employee for "walking off the job," (A. Garcia at 48:2-24), and plaintiff could not recall it happening to another employee, (Thomsen Dep. at 85:24-87:1).

Because the Employee Manual is silent as to the consequence of an employee's refusal to work incidental overtime, but lays out a detailed attendance policy and point system, a reasonable jury could infer that defendant intended for the refusal to work incidental overtime to be treated as an attendance violation. Moreover, if plaintiff had simply failed to show up for his originally scheduled shift—and thus not been present for the alleged demand to work incidental overtime—he would have

been assessed only two points under the attendance policy. A reasonable jury could thus infer that defendant knew its termination decision was inconsistent with the attendance policy and defendant simply seized on an opportunity to terminate plaintiff's employment to avoid having to continue to accommodate his disability.

Not only could a jury find that termination for plaintiff's alleged misconduct is inconsistent with defendant's attendance policy, triable issues also exist as to whether termination was consistent with defendant's past practices. While Jose Garcia testified he believed two other employees had been terminated for similar misconduct, he also testified that he lacked knowledge of the specific facts leading to the termination of those employees. (J. Garcia Dep. at 12:14-15:6.) Additionally, although Lloyd recalls checking one prior employee's personnel file, she does not recall confirming any details in the file except the existence of the termination notice. (Lloyd Dep. at 22:21-24:11.) Lara also testified that he had contacted Jose Garcia when he discovered plaintiff had left in order to let him know that one of the machines would not be operating, not because he was suggesting that plaintiff should be disciplined. (Lara Dep. at 25:10-20.)

The lack of a clear warning or prior practice of terminating employees who refuse to work incidental overtime is in stark contrast to the employer's unequivocal warning in King about termination prior to the employee's misconduct. In King, the employer terminated the employee for violating its integrity policy when the employee had allegedly "encouraged a driver to falsify a timecard to bring it into compliance with federal regulations limiting driving time." 152 Cal.App.4th at 429, 60 Cal. Rptr.3d 359. Prior to terminating the employee for this misconduct, the employer

had (1) terminated the employee's supervisor for failing to have communicated the driving time regulations to plaintiff; and (2) met with plaintiff on two prior occasions to go over the driving time policy and warn him that his job was in jeopardy if he did not monitor and accurately report drivers' hours. Id. at 436–37, 60 Cal.Rptr.3d 359. In King, it was "undisputed that plaintiff was well aware of company policy, his responsibility, and the consequences that would ensue if he failed to meet his responsibility." Id. at 437, 60 Cal.Rptr.3d 359. It is far from undisputed in this case that plaintiff—or even defendant for that matter—understood that termination was likely to occur if an employee refused to work incidental overtime.

Defendant's knowledge that plaintiff's disability was permanent and could necessitate additional time off work also gives rise to the inference that plaintiff's termination for failing to work incidental overtime was mere pretext. On January 17, 2014, a Panel Qualified Medical Evaluation ("PQME") was performed on plaintiff for purposes of his workers' compensation claim. (Whitten Decl. Ex. P at 1.) The PQME indicated that plaintiff is at "maximum medical improvement," his disability is "permanent and stationary," and he may require additional surgery on his shoulder. (Id. Ex. P at 18-19; see also J. Garcia Dep. at 38:24-39:4 (explaining that "maximum medical improvement" means the individual will "never get better than what [he is] currently at").) This diagnosis was consistent with prior medical examinations in which plaintiff's physician found he required permanent work restrictions and potentially required another surgery. (Pangborn Decl. at 156.)

Although Del Razo does not recall seeing the PQME, he testified that, prior to making the decision to terminate plaintiff, he knew that plaintiff "was at his maximum medical improvement" and had been found to be "permanent and stationary." (Del Razo Dep. at 85:22-25.) Jose Garcia testified he knew at the time of plaintiff's termination that plaintiff would always require an accommodation. (J. Garcia Dep. at 50:4-14.) Plaintiff has also raised a triable issue of fact that Lloyd was aware of the results of the recent PQME prior to making the termination decision. The notation in the corner of ESIS's copy of the PQME suggests that ESIS received the PQME on February 21, 2014. (Whitten Decl. Ex. P at 1.) On February 20, 2014, Lloyd had emailed Brown stating, "We have an issue with Jan and I need to connect with you regarding his status ASAP. Did we get a full duty release for him?" (Id. Ex. C at Ex. 62.) A jury could infer that Lloyd asked about whether a "full duty release" was obtained because she was aware a PQME had recently been performed. In response to Lloyd's email, Brown and Lloyd had a subsequent phone conversation and a reasonable jury could infer that Brown responded to Lloyd's question about whether a full release was obtained in that conversation. (See Lloyd Dep. at 115:10-25.)

Taking all inferences in favor of plaintiff, a jury could also infer from Lloyd's February 20, 2014 email to Brown that the "issue" Lloyd was referring to was plaintiff's conduct on the prior day. In the timeline Lara submitted to Lloyd, Del Razo, and Jose Garcia about the February 19, 2014 incident, he also began by memorializing plaintiff's shoulder injury and including the November 2013 permanent lifting restriction. Lloyd's email and Lara's timeline give rise to the inference that the decision makers were not evaluating the February 19, 2014 incident independent of plaintiff's disability.

On February 25, 2014, plaintiff also informed Del Razo that he was "going to

pursue disability vs. continuing to work" because of his shoulder pain and that "he would seek permanent disability whether he has a job or not." (Pangborn Decl. at 357.) Del Razo relayed this information to Lloyd and Anthony Garcia via email. (Id.) It is undisputed that defendant provided a salary continuation plan that would have provided for plaintiff to take six months of short-term disability leave and that defendant would have continued to pay him during that leave. (McDonald Dep. at 18:5–19:1; see also Lloyd Dep. at 81:11-22 (testifying that she was aware of the salary continuation plan and that defendant paid that benefit).)

According to defendant, plaintiff's intent to take additional disability was unknown at the time the termination decision was made because the decision was made on February 24, 2014. (Lloyd Dep. at 12:3-16.) However, Del Razo's February 25, 2014 email recounts how plaintiff was apologetic for his conduct on February 19, 2014 and had attempted to explain his actions. (Id.) Based on Del Razo's inclusion of plaintiff's apologies and explanations in the email, a jury could infer that Del Razo thought this information was relevant to a termination decision that had not yet been made or finalized. Defendant also did not draft the termination notice until February 28, 2014, (Del Razo Dep. at 104:8-17), which is four days after when Lloyd contends the decision had been made. Plaintiff has thus established a genuine dispute as to when defendant made the decision to terminate him and whether it knew plaintiff was planning to take additional paid disability leave at the time it made the decision.

When considering all of this evidence, a jury could find that plaintiff's disability motivated defendant's decision to terminate him and that his termination for having refused to work incidental overtime was mere pretext. Accordingly, the court must deny defendant's motion for summary judgment on plaintiff's subsection 12940(a) FEHA claim.

## C. Wrongful Termination in Violation of Public Policy

Defendant concedes that plaintiff's wrongful termination of public policy claim rises and falls with his FEHA claims. (Def.'s Mem. at 24:6-13.) Accordingly, because plaintiff has established triable issues of fact on his FEHA claims, the court must also deny defendant's motion for summary judgment on his wrongful termination in violation of public policy claim.

## D. Defamation Claim

Under California law, "[t]he elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." Wong v. Tai Jing, 189 Cal.App.4th 1354, 1369, 117 Cal.Rptr.3d 747 (6th Dist.2010) (citing Taus v. Loftus, 40 Cal.4th 683, 720, 54 Cal.Rptr.3d 775, 151 P.3d 1185 (2007)). Plaintiff bases his defamation claim on the alleged false statements Jose Garcia and Lara made to Lloyd and Del Razo about (1) plaintiff leaving without his relief being present; (2) plaintiff using profanity when he left; (3) one of the machines being unable to run because plaintiff left; and (4) that plaintiff deserved to be terminated because of his conduct.[5] (Pl.'s Opp'n at

5. At oral argument, plaintiff's counsel indicated that plaintiff's defamation claim is also based on the failure of certain managers within the company to investigate the alleged false information reported to them. Plaintiff's counsel could not articulate how a mere lis-

tener to an alleged defamatory statement could ever be liable for defamation. The only case counsel cited at oral argument was Rollenhagen v. City of Orange, 116 Cal.App.3d 414, 172 Cal.Rptr. 49 (4th Dist.1981). That case addressed a broadcaster's failure to in-

18:16-19:5.) Even assuming plaintiff could establish a triable issue as to the falsity of these statements and that they were published, defendant contends the statements were nonetheless privileged under California Civil Code subsection 47(c).

Subsection 47(c) provides that a communication is privileged if it is made "without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." Cal. Civ. Code § 47. Plaintiff does not, and cannot, dispute that Jose Garcia and Lara had a common interest as supervisors in communicating information to management that was relevant to the alleged misconduct and potential discipline of one of defendant's employees. Cf. King, 152 Cal.App.4th at 440, 60 Cal. Rptr.3d 359 ("[B]ecause an employer and its employees have a common interest in protecting the workplace from abuse, an employer's statements to employees regarding the reasons for termination of another employee generally are privileged."). Plaintiff argues only that the communications are not privileged because a reasonable jury could find that they were made with malice.

■■■■■ "Insofar as the common-interest privilege is concerned, malice is not inferred from the communication itself." Noel v. River Hills Wilsons, Inc., 113 Cal. App.4th 1363, 1370, 7 Cal.Rptr.3d 216 (4th Dist.2003). "The malice necessary to defeat a qualified privilege is actual malice which is established by a showing that the publi-

cation was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." Id. (quoting Sanborn v. Chronicle Publ'g Co., 18 Cal.3d 406, 413, 134 Cal.Rptr. 402, 556 P.2d 764 (1976)) (internal quotation marks omitted). "[M]alice focuses upon the defendant's state of mind, not his [or her] conduct. Mere negligence in inquiry cannot constitute lack of reasonable or probable cause." Id. (internal quotations marks and citation omitted) (alterations in original).

■■■■ Plaintiff has not put forth any evidence even giving rise to the inference that Jose Garcia and Lara were motivated by hatred or ill will when they made the statements underlying his defamation claim. Plaintiff nonetheless contends a jury could find that they made the statements with malice because they failed to thoroughly investigate the incident and thus lacked reasonable grounds to believe that the statements were true. The strongest evidence that plaintiff believed he was authorized to leave is Ramirez's statements that he told plaintiff he was there to relieve him. (See Ramirez Decl. ¶ 4.) Ramirez, however, did not share this information with defendant until after this litigation commenced.

While defendant could have interviewed Ramirez when it interviewed other employees, plaintiff's own dishonesty made such an interview irrelevant. It is undisputed that Del Razo and Lloyd called plaintiff the day of the incident to inquire why he had not stayed on to work the incidental overtime.[6] (Del Razo Dep. at

vestigate prior to making a defamatory statement, not any duty on behalf of a person who hears a defamatory statement to investigate whether the statement is true before making a decision based on that statement. See Rollen-

hagen, 116 Cal.App.3d at 423, 172 Cal.Rptr. 49.

6. Any suggestion that Jose Garcia or Lara should have interviewed plaintiff or others

87:4-25.) In response, plaintiff told them that he left because he had appointments he could not miss. (Id. at 90:25-91:11.) Plaintiff never told defendant or even suggested during that interview that he believed he was allowed to leave because Ramirez had told him that he was there to relieve him. Instead, he repeated the same excuse that he has since admitted was false. (Thomsen Dep. at 73:1-75:25.) A reasonable jury could not infer that defendant acted negligently—let alone with malice—in failing to interview Ramirez because plaintiff's own lie made that interview entirely irrelevant.

Accordingly, because a reasonable jury could not find that any of defendant's employees made the communications at issue with malice, the communications are privileged under subsection 47(c) and the court must grant defendant's motion for summary judgment on plaintiff's defamation claim.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment be, and the same hereby is, DENIED with respect to plaintiff's FEHA subsections 12940(a), (m), and (n) claims and wrongful termination in violation of public policy claim; and GRANTED with respect to plaintiff's defamation claim.

---

prior to even reporting the alleged misconduct to Lloyd and Del Razo ignores the division of responsibility in a company as large as defendant. Additionally, while plaintiff contends defendant could have learned that Ramirez was relieving him by checking the schedule as plaintiff contends it existed that day, failure to check the schedule in light of plaintiff's representations as to why he left was negligent at most. See Noel, 113 Cal.

App.4th at 1371, 7 Cal.Rptr.3d 216 ("[M]ere negligence...in the sense of oversight or unintentional error, is not alone enough to constitute malice. It is only when the negligence amounts to a reckless or wanton disregard for the truth, so as to reasonably imply a wilful disregard for or avoidance of accuracy, that malice is shown." (internal quotation marks and citation omitted) (omission in original)).